## Case No. 16,341.

### UNITED STATES v. SMITH.

[1 Sawy. 277;[1] 12 Int. Rev. Rec. 135.]

District Court, D. Oregon. Aug. 22, 1870.

JURY—WAIVER OF CHALLENGES FOR CAUSE—NEW TRIAL—INCOME TAX—PROFITS ON STOCKS—EXCHANGE OF PROPERTY—PERJURY—PROVINCE OF COURT AND JURY.

1. Where a defendant is informed by the examination of a juror that he has had a conversation with a third person about the case, and makes no challenge on that ground, but accepts the juror, he cannot afterwards object to the verdict on that account.

2. Applications for new trials on the ground of newly-discovered evidence, are liable to great abuse, and are therefore regarded with jealousy and construed with great strictness.

3. To entitle a defendant to a new trial on the ground of newly-discovered evidence, it must appear (1) that the party has discovered the evidence, or that it has come to his knowledge since the last trial; and (2) that it is so material that it would probably produce a different verdict if the new trial were granted.

4. The successive acts of congress, from that of August 5, 1861 (12 Stat. 309), to that of March 2, 1867 (14 Stat. 479), upon the subject of taxing incomes, construed as being in pari materia, and requiring a return for taxation as income of all gains derived from the sale of corporation stocks in 1868. if purchased at any time after August 5, 1861.

5. A bona fide exchange of stocks for other property, however much to the apparent advantage of the owner of the stocks, is not a sale thereof, from which profits are derived liable to taxation as income.

6. A transfer of stocks for a promissory note, which is collectible, or an exchange thereof for

land, followed by a sale of such land within the year, for collectible promissory notes, is to be considered a sale of such stock for so much cash.

7. Although the affidavit of a party to h's income return be false, he cannot be convicted of perjury thereon, unless it was made with a corrupt intention, and therefore, if such party, as a matter of law or fact, honestly believed that he was not bound to return any profits from the sale of stocks, for taxation, then. although he was mistaken and his affidavit in this respect false, he cannot be convicted of perjury.

8. The tax upon incomes is both just and expedient, and the objection that it is inquisitorial applies with equal force to the state law which provides for imposing a direct tax upon all the articles of property of which a person is possessed.

9. Upon an indictment for perjury, whether the oath was knowingly and corruptly false, is a question for the jury, and the court will not set aside their verdict thereon, unless it is clearly against the weight of evidence.

10. Although the act imposing a tax upon incomes (14 Stat. 479) makes no provision for compelling a person to make oath to his return of income, yet it permits him to do so, and if he avails himself of the privilege, and intentionally swears falsely, he is guilty of perjury. 13 Stat. 239.

11. The profits made upon a sale of stocks in 1868 were taxable as income for that year, without reference to the year in which the increase in the value of the stocks occurred, so that it was subsequent to the act of August 5, 1861 (12 Stat. 309), imposing a tax on incomes.

12. Whether a false oath was taken under mistake as to the law or fact involved therein, is a question of fact for the jury.

13. A new trial will not be granted upon the ground that the evidence of a witness took the party by surprise, unless it appears that such surprise is in no degree attributable to the negligence of such party.

14. The circumstances under and for which perjury was committed, considered with reference to the punishment proper to impose upon a party convicted thereof.

On August 6, 1869, the defendant [William K. Smith] was indicted for the crime of perjury, in swearing to his income return. 4 Stat. 118; 12 Stat. 309. The indictment alleged in substance and effect that the defendant on March 22, 1869, made an affidavit before the assistant assessor of the Fourth division of the district aforesaid, that a certain statement then made by him contained a full, true, particular and correct account of defendant's income subject to income tax for the year 1868; and that he had not received, and was not entitled to receive from any and all sources of income together, any other sum for said year besides what was set forth in said statement in detail: whereas, in truth and in fact, said statement did not contain a full, true, particular and correct account of the defendant's income for 1868, subject to an income tax, and that defendant received and was entitled to receive from any and all sources together other sums and a greater sum for the year 1868, besides what was set forth in said statement in detail; and that the defendant at

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

the time of making said affidavit and statement well knew that the same was false.

Upon arraignment, the defendant pleaded not guilty, and on August 24, and three days thereafter, the cause was tried before a jury, who being unable to agree, were discharged without giving a verdict. Thereupon, on application of the defendant, the cause was continued until the term of March, 1870, when it was again continued by consent of parties until July 12. On the last mentioned date it was tried before a jury who, on July 14, found the defendant guilty as charged in the indictment, and recommended him to the mercy of the court. On July 19, a motion for new trial was filed, and on the application of the defendant the hearing was continued until August 5, when it was argued by counsel and submitted.

J. C. Cartwright, for the United States.

Wm. Strong and David Logan, for defendant.

DEADY, District Judge. The motion for a new trial is based on the following grounds: (1) Misconduct of James Winston. one of the trial jurors. (2) Newly-discovered evidence. (3) Insufficiency of the evidence to justify the verdict. (4) That the verdict is against law. (5) That the defendant was taken by surprise by the testimony of Mellen, the assistant assessor.

On the first trial, when the prosecution offered in evidence the defendant's statement of income for the year 1868, the defense objected to the proof because the assignment of perjury in the indictment was too general—merely negativing the words of the affidavit—while it should have been assigned specially upon some particular fact or matter sworn to by defendant. The court ruled that the objection should have been taken by motion or demurrer; and that after the plea of not guilty it came too late; but in order to apprise the defense of what particular fact or matter in the statement the prosecution relied upon to show the falsity of the affidavit, the court required the latter to elect and declare in what particular it expected to prove such statement false. The prosecution then elected to prove the statement false in subdivisions 5 and 13, relating respectively to income derived "from profits realized by sales of real estate purchased since December, 1868," and the "profits on the sales of gold or stocks. whenever purchased;" but in fact the evidence was confined to the matter of profits arising from the sale of stocks. On the second trial the same formal proceedings were not had upon this question, but the rule established on the first was followed without question, and the evidence of the prosecution upon this branch of the case was confined to the question of whether or not the defendant had made profits from the sale of stocks during 1868.

The statement of the defendant's income was in the usual form of blank 24, and purported to be a "detailed statement of the income, gains and profits of W. K. Smith, of Salem, Oregon, during the year 1868." The gross amount of income in currency contained in the statement was $7,617.14, which was stated in detail under the various subdivisions as follows: First—from profits in any trade, business or vocation, etc., $3,849. Third—from rents, $400. Eighth—from profits in corporation, not divided, $766.66. Tenth—from interest otherwise than on United States securities, $640. Eleventh—from salary other than as an officer of the United States, $1,861.48. The deductions amounted to $1,579.86, leaving the taxable income, returned by the defendant, to be $5,937.28. No income was returned by the defendant under the subdivisions 5 or 13.

As to the alleged misconduct of Winston, the facts appear to be as follows: Being returned on the venire to serve as a trial juror at the term at which the defendant was to be tried, he was drawn by the clerk in the formation of the jury in this case. Being sworn concerning his qualifications to sit on the jury, on examination by defendant's counsel, he stated that since he was summoned as a juror, and since his arrival in the city, he had a casual conversation with Dr. Cardwell about this case, but that he had no decided opinion as to the merits of it. The defense interposed no challenge, and after some deliberation, accepted the juror, and he was sworn. At the same time the court directed a rule to be entered and served upon the juror, requiring him to appear and show cause why he should not be punished as for contempt, on account of his engaging in conversation with third parties concerning cases pending in this court after he was summoned to serve therein as a juror. On July 16, two days after the jury had given their verdict, Winston showed cause, and answered that he had had a brief conversation with Dr. Cardwell concerning this case after he was summoned as a juror, which arose in this way: Winston stated to Cardwell that he was here as a juror and would consequently be in the city for some time, when Cardwell remarked that he supposed the Case of Smith would come up for trial. Winston replied, by asking what kind of a cause it was? Cardwell answered, that Smith was accused of making and swearing to two different income returns the same year. Winston replied that it must be some sharp practice to get rid of the income tax. Winston also stated that it was in nowise his intention to prejudice his mind in relation to this case or disqualify himself to sit therein as a juror. Upon reading the answer, the court discharged the rule on payment of the costs by Winston. If a challenge had been submitted to this juror for bias, it might have been

allowed, yet it is not beyond question that it should have been. The conversation was casual, and was not introduced by the juror. He appears to be a stranger to the defendant, and an intelligent, fair man; nor is there any suspicion or suggestion that Cardwell was in any way inimical to the defendant, or that he desired to prejudice the juror against him. The information communicated by Cardwell to the juror, and upon which the latter made the remark that he did, was a very general allusion to the case, and not by any means a correct statement of the crime with which the defendant was charged, nor of the facts which constitute it. Swearing to two different income returns for the same year is not in itself a crime, though the fact may tend to convict the party of the crime of perjury in swearing to one or the other of them, if they be different in the sense of contradictory as well as distinct; nor does the remark of the juror about "sharp practice" necessarily indicate that the information then received made an impression upon his mind that the defendant was guilty or any crime—let alone that of perjury. Indeed, by the expression "sharp practice" men commonly designate acts or conduct which, although contrary to good morals or the golden rule, are not punishable as crimes by the law of the land.

But the decisive answer to the motion on this ground is, that the defendant accepted this juror with a full knowledge of the fact that he had conversed with Cardwell about the case, and had gotten some impression about it from such conversation. A party who knows of a ground of challenge, and does not seasonably take it, must be deemed to have waived it. 2 Grah. & W. New Trials, 247; Davis v. Allen, 11 Pick. 467. If the defense supposed that this impression was in their favor, as it is quite likely they did, and accepted the juror on account of it, they took their chance so far for a favorable verdict, and must abide by the result. But counsel for the defense say now, that if they had known the nature of this conversation, they would not have accepted the juror. But counsel are aware that, according to the practice of this court, the defendant was not entitled to know the particulars of this conversation nor the nature of the impression produced by it, if any. It was sufficient, if the juror disclosed the fact that he had had a conversation upon the subject, and with whom, and whether he had formed an opinion as to the guilt of the defendant from such conversation. But if this were otherwise, the defendant cannot now complain of the want of this information, because the juror was not interrogated on this point. He was only sworn to answer questions touching his qualifications, and he was not bound to volunteer information beyond the scope of the inquiries propounded to him. If the defense accepted this juror in ignorance of the nature of this conversation and the impression produced by it, this is no ground for

a new trial. They were either not entitled to such information, or otherwise they neglected to ask for it when they knew of its existence. The defense, as must be presumed, supposing that Winston, notwithstanding the conversation or on account of it, was comparatively a safe juror for them, accepted him, cannot now be heard to object to the verdict on that account. In the statement of this matter in the motion, it is said that Winston swore on his voir dire, that he was an "impartial juror." This is a manifest mistake. Whether the person drawn as a juror is impartial between the parties or not, is a question to be tried and decided by the court, and not the witness. The juror was examined at some length, and the substance of his testimony was, that he had had the conversation as above stated, but had formed no decided opinion as to the guilt or innocence of the defendant. He may have also stated that he thought he could try the case according to the evidence. Counsel sometimes ask such questions, and they are allowed to be answered because not objected to. In any event, I have no doubt that he told the truth, for he learned nothing in such conversation upon which to form any opinion as to whether the defendant was guilty of the crime of perjury. There is no reason to suspect that the juror acted from improper motives, or that any person ever sought to prejudice his mind against the defendant. It was admitted by counsel, on the argument, that the juror was otherwise an unobjectionable man, and I can see no reason to doubt that he formed and gave his verdict according to his oath, upon the testimony given him in court, and not otherwise.

Before considering specially the second and third grounds of the motion, it will be necessary to state the substance of the case as it appeared before the jury. During 1862 and 1865, and the years inclusive, the defendant became the owner of eleven shares of the Wallamet Woolen Manufacturing Company stock, at Salem, at a cost of $350 to $830 in coin per share, the aggregate cost being $7,480. Early in the year 1868, he disposed of this stock to Robert Kinney, for cash, notes and property, then valued by the parties to be worth in the aggregate $33,000 in coin; namely, cash $10,000; about ten acres of land, with grist-mill and four-mule team and wagon, at McMinville, valued at $10,500; 960 acres of land, with live stock, in Chehalem Valley, valued at $6,000; Kinney's notes, bearing interest and secured by a deposit of two shares of the stock, for $6,500. On July 10, 1868, the defendant sold and conveyed the McMinville property, except the mule team, to John Saxe for $9,500 in coin. Saxe paid $1,000 down and gave his three notes in equal sums for the remainder of the purchase money, payable in one, two and three years, with interest at one per centum per month, and secured by mortgage upon the premises. During the time the defendant owned these shares, the Wallamet Woolen Manufacturing Compa-

ny paid no dividends, and the profits accruing on the stock were estimated and returned for taxation as undivided profits, as follows: For 1864 and 1866, by the company, at $2,475 and $6,238 88 respectively; and for 1865 and 1867, by the defendant, at $4,271 96 and $2,024 66 respectively. These profits are stated in currency, and aggregate $14,985 50. The statement of income for 1868 was made in currency at seventy-five cents on the dollar. Converting the first cost of the stock into currency, at this rate, gives $9,973 33. Add to this the aggregate of undivided profits which had paid taxes, gives a sum total of $24,958 83. Converting the cash, notes and property received by defendant from Kinney, at their estimated value, into currency at the above rate, gives $44,000 received for the stock. The difference between this sum and the cost of the stock and the profits which had paid taxes, is $19,041 17. This latter sum, the prosecution maintained, represented the profits which the defendant had made in 1868 by the sale of the stocks, upon which no taxes had been paid, and which he ought to have included in his return for that year.

The foregoing statements were not questioned on the trial, and I have stated them as facts established in the case. The evidence in support of them was ample and uncontradicted. The calculations were made by the district attorney and read to the jury without question on the argument, and therefore I have adopted them without verifying them.

W. A. K. Mellen, the assistant assessor for the Fourth division, including Salem, testified that the defendant, then living at Salem, on March 22, 1869, in pursuance of a notice and blank from his office, appeared before him at Salem to make his statement of income for 1868. Mellen had heard of the sale of stocks to Kinney, but was not aware of the details of the transaction, nor had he any knowledge of what the stocks cost the defendant. After the defendant had made the statement of income as above set forth, Mellen called his attention to this transfer of stocks, and told him that the law required him to make out an exhibit of the facts. Defendant said that he had returned all the income that he was entitled to, and refused to make any statement of income under subdivision 13. In the course of the conversation upon this subject, which lasted about fifteen minutes, defendant admitted to Mellen that he got $10.000 cash from Kinney, but did not inform him further as to the nature of the consideration which he received, and claimed that the transaction was a swap, and therefore no profits had arisen from it to be returned. Mellen replied, that he ought to return the shares represented by the $10,000 cash. The defendant refused to do so, and swore to the statement as above stated, without inserting any sum as profits derived from the sale of stocks.

Afterwards, Mellen gave defendant notice to appear and show cause why his statement of income should not be increased $20,000, on account of this stock transaction. In pursuance of this notice, and between April 1 and 4, the defendant appeared before Mellen, at Salem. Mellen then told the defendant that he had increased his return so as to get from him a statement of this stock transaction, and that if defendant would give witness the figures of the purchase and sale, and that made the profits less than the increase, he would reduce it. Defendant then contended that the profits on the stock had already been returned and paid tax as undivided profits of Wallamet Woolen Manufacturing Company; and said that he could not give a statement of the facts as to the cost and sale of shares. because his memorandum book was in Portland. Mellen then told him that he could appear before Mr. Frazar, the assessor at the Portland office, and attend to the matter there.

Thomas Frazar, the assessor for the district of Oregon, testified, that prior to April 10, 1869, defendant came to his office and said that he and Mellen had disagreed about his income return, and Mellen had sent him to witness' office to arrange the matter, and he wanted to make his return here, as he was coming here to live. Witness asked if defendant had any statement to make up income from? Defendant said, none. Witness asked defendant for memorandum book containing cost of stock. Defendant said he had lost it. Witness said he could not make up a return without some statement, and have to estimate return and assess penalty. Defendant said he had not a scratch of pen to tell what he gave for the stock or what he sold it for. About April 12, defendant returned and handed witness a statement in pencil writing, which was produced by the witness and read to the jury. It set forth, that defendant "sold, traded and transferred, on October 9, 1868, nine shares of Wallamet Woolen Manufacturing Company stock, the proceeds of trade used, as I remember, in payment of my liabilities in taking up a note held by Ladd & Tilton for between $4,000 and $5,000, including interest, and in paying for sawmill, etc., altogether amounting to, I think, $10,000, and real estate in Yamhill county." Then follows, to the effect, that John F. Miller had offered to trade defendant Portland property for four of his shares, and the most he could get offered for the property was $4,000. That subsequently, Miller offered to sell defendant his shares for $2,250 per share, and defendant would have taken much less for his in cash, but could get no offer. That defendant could only approximate to cost of shares: "Eight or ten shares were offered to the company before I went to California, at $1,000 per share, I think in the spring of 1863, and subsequently were purchased; and I had to take them, or a large portion of them, paying large interest until they were paid for. On the early purchases of the stock the rate of interest was high; I remember paying high interest on a large

amount of money borrowed." After looking at this memorandum, witness asked defendant if he expected that witness could make up a return from that paper? Defendant said he had nothing else. Witness then told defendant that he would assist him, and asked him to state the facts from memory. Defendant then stated, that he and Miller and J. S. Smith had purchased stock whenever they could, to get control of the company, and paid from $500 to $1,250 per share. Defendant represented to witness, that while he had disposed of eleven shares to Kinney, that he considered he had only sold him nine shares, because he held the other two shares as collateral security for Kinney's note. He said these nine shares cost, in the aggregate, $8,010, or $890 apiece—and that he had borrowed money to purchase this stock and paid interest to the amount of $5,000. That he sold to Kinney, for $10,000 in cash, 960 acres of land in Yamhill county, and property in McMinnville; that the land was only worth $2.50 per acre, or $2,000 in round numbers; and the McMinnville property, $5,000—thus making the cost of the nine shares, including $5,000 interest, $13,010, and the proceeds of their sale $17,000—which left an apparent profit of $3,990 in coin. This being converted into currency at the above rate, gives $5,320. The witness made a memorandum of this statement at the time, which he produced in court and testified from. Witness testified, that at this time he was not aware that there was a mill upon the McMinnville property, but supposed, from defendant's conversation, that it was only ten acres of land; nor was he aware, nor did the defendant inform him, that it had been sold the July previous to Saxe for $9,500, as above stated. Witness then stated that he would take occasion to ascertain about the matter, and the defendant went away. Afterward, witness having ascertained that there was a mill on the McMinnville property, and also the sale of it to Saxe, and that defendant had received other property for his stocks which he had not mentioned to him, caused Assistant Mellen, on May 7, to issue and serve a notice on defendant, to appear at witness' office on May 24, and show cause why the penalties prescribed by law should not be assessed against him, for making a false and incorrect return of his gains and income for 1868.

On the same day the defendant came into the office and said: "What's the matter?" Witness said that defendant's statements were not satisfactory. Defendant said that he had made all the statements he could make. Witness then asked defendant if he was willing to make an amended return upon the basis of the statement and figures that he had given witness at last interview? Defendant said he was. Witness then took a blank and filled it up with the same sums as the first one made before Mellen, except that under subdivision 13 he inserted as profits on sales of stocks the sum of $5,320. The defendant then signed the return and swore to it; after which he said: "I suppose I may have my first return now." To which witness answered, "No—that's a record of the office." Witness then said to defendant: "What am I to think of a man who, while an officer was assisting him to make his return, would make such a false statement to him as defendant did to witness a few days before? That defendant had estimated the value of the McMinnville property to witness at $5,000, when he had sold it months before at $9,500." To this defendant made no particular reply, but left the office. Witness also stated, that in one of the conversations, and he thinks the first one, defendant claimed that the disposition of the stock was not a sale, but a trade. On the cross-examination, witness stated that he did not inform defendant at the last interview what he had learned of the sale of the McMinnville property; and that he did not do so, because he wanted to see if the defendant would swear to what he knew to be false; and also, that he had not said to Mellen that he would get defendant to sign the second return, and then prosecute him; but that he was very indignant at the time, and probably said defendant ought to be prosecuted.

Joseph S. Watt testified that he knew the 960-acre farm in Yamhill county, that defendant received from Kinney; that about two years ago, some time in 1868, the defendant wanted to sell it to him, and asked $10 per acre for it, and that at that time and since it was worth in cash $7 per acre.

William S. Ladd, called by the defendant, testified that on June 13, 1868, the defendant paid him a note of $4,000, with $104 interest upon it, and that the defendant did not pay him any other interest during that year.

John H. Hayden, called by the defendant, testified that on March 28, 1868, the defendant became an equal partner in a certain sawmill and business in the city with himself and Carter, and that the net profits of the mill for the year were $10,000 in coin, of which the defendant received about $2,500. This sum converted into currency at the above rate gives $3,333.

John F. Miller, called by the defendant, testified that in June, 1868, he offered seventeen shares of Wallamet Woolen Manufacturing Company stock to defendant for $2,250 in cash per share; that he was not able to state that there was any change in the value of shares between January and June, 1868, and that he thought the shares were worth more in 1867 than at any other time.

The newly-discovered evidence upon which the defendant asks for a new trial is set forth in the affidavit of the defendant, and the accompanying ones of S. A. Clarke, A. J. McEwan and J. S. Smith. By the affidavit of Clarke, it appears that on May 5, 1868, he was editor of the Daily Record, published in the town of Salem, and that

on that day he published a paragraph concerning this sale of stock, to the effect that he had learned that the defendant had sold to Kinney eleven shares of Wallamet Woolen Manufacturing Company stock, and also six other shares to other members of the company, and that he had not got the exact terms of sale, but learned from Kinney that he had paid a little less than $3,000 per share, and that he remembered it once sold at one tenth the price it now goes. Clarke adds, that when he asked defendant about terms of sale, he confirmed what Kinney had said, and assented to the publication of the particulars by not objecting when informed of his intention to do so. By the affidavit of A. J. McEwan, it appears that on March 4, 1869, he was clerk in the sawmill of Hayden, Smith & Co., at Portland, and that on that day he wrote to defendant at Salem as follows: "Sir—The net profits of sales made from October 1, 1868, to February 27, 1869, $2,149.79. Business improves rapidly since March 1." The letter accompanies the affidavit, and the affidavit states that "it was intended by me at the time to contain a true statement of the net profits of the business of the firm" for the time specified. The affidavit of the defendant states, that until after May 7, 1869, he believed that Saxe was not personally bound to pay the notes given by him for the McMinnville property, and that he could only look to the property for payment, and that he did not believe that the property "was available" for the security of more than $5,000 or $6,000, and that he knew no better until informed by J. S. Smith, after May 7, aforesaid, that Saxe was personally liable upon the notes. The affidavit of J. S. Smith states, that he is an attorney and brother of the defendant, and that shortly after his return from Washington, in July, 1869, defendant expressed great anxiety for fear he would have to take back the McMinnville property at a loss, and evidently labored under the impression that the only security he had for the payment of the purchase money was the property itself, and feared that Saxe, after keeping it a year or two, would return it in such a condition that he could not realize the purchase money from it. That affiant then assured defendant that Saxe was liable, as well as the property, for the money; and from the surprise and gratification then manifested by defendant, he is well satisfied that up to that time defendant had been laboring under the impression that the property was all the security he had, and that he could not realize the balance of the purchase money from it. Defendant, in his affidavit, states, that he was not aware of the materiality of any of these facts until since the trial, when he communicated them to his counsel for the first time.

To be entitled to a new trial on the ground of newly-discovered evidence, the party must satisfy the court that the evidence has come to his knowledge since the trial—that he has discovered it. Grah. & W. New Trials, 1021. Now, it is manifest and practically admitted that these facts were within the knowledge of the defendant before the first trial—in fact, ever since they occurred. It matters not that the defendant did not communicate them to his counsel, because they must have been discovered since the trial by the party, and not his counsel. Id. 1093. If this were otherwise, a party might always secure to himself a new trial by withholding from his counsel some material fact until after a verdict had gone against him. Applications for new trials upon the ground of newly-discovered evidence are liable to great abuse, and are therefore regarded with jealousy and construed with great strictness. Id. 1021. Indeed, I cannot but express my surprise that counsel could consent to maintain before a court that this was newly-discovered evidence.

Again, if the evidence were newly discovered, the court must be satisfied, before granting a new trial, that it is so material that it would probably produce a different verdict if the new trial were granted. Id. 1021. Now, none of this evidence bears directly upon the main question tried by the jury—the willful falsity of the oath of March 22—upon the point, whether the defendant made any profits, or not, in 1868, from the sales of stock, whenever purchased. The evidence of Clarke upon this question amounts to nothing. If anything, it proves, that on May 7, 1868, both the defendant and Kinney admitted that there was a sale of eleven shares of this stock for nearly $3,000 per share, although on the trial there was a weak attempt to prove that it was an exchange of stock and property at fictitious values. The paragraph from the Daily Record discloses no details of the stock transactions of the defendant except the sale of eleven shares at $3,000 per share. Now, Mellen testified on both trials, that he had heard of the sale. But when defendant said it was a "swap," he wanted to know the details as to what property he got for the stock, and more than all, what he gave for it. It cannot be pretended that there is any information in the paragraph upon these subjects, and these are the details that Mellen professed to be ignorant of, and tried in vain to get the defendant to inform him concerning. Indeed, on the principal point—the cost of the stock—the defendant professed to be ignorant himself. And again, if Mellen knew all about the purchase and sale of the stock, I am at a loss to conceive how that excuses or justifies the defendant for committing a mistake or falsehood in stating his income.

Before noticing specially the evidence of McEwan, it must be stated, that Mellen testified that defendant, after returning or stating the items of salary, rent and undivided profits, proposed to return a gross sum under subdivision 14, of either $1,700 or $1,170, and that he objected, and said it must be "itemized," whereupon defendant said it was for

interest received and the profits of a sawmill in Portland. Mellen then took a piece of paper down that had been sent him from the Portland office, showing the profits of that mill—the mill of Hayden, Smith & Co.—when defendant substituted that statement for his, and entered it in subdivision 1. It is probable that defendant had the letter from McEwan in his hand at the time. On the first trial, Mellen swore that defendant took a paper from his pocket on which he thought he had amount of profits of Portland mill. On the second trial, his attention was not called to it, and he omitted to mention it. The defense, with the consent of the prosecution, examined Hayden as above stated, to show the true profits of the mill, and that the defendant had returned more under that head than he was entitled to, and therefore it was not likely that he intended to defraud the government in the matter of the sale of the stock. But it appearing from the testimony of Mr. Hayden that the defendant's share of the profits of the mill was $3,333, in currency, a sum larger by nearly fifty per cent. than the largest sum which the defendant proposed to return as profits from mill and interest both—that is, $1,700 coin, or $2,226 currency, counsel for the prosecution argued to the jury, that upon the testimony introduced by the defendant, it appeared that he had attempted to return his mill profits much below the true figure, and therefore it was not unlikely that he would attempt to defraud the government out of the tax upon the profits on sale of stock. The evidence of McEwan is intended to show that the defendant, in offering to return $1,700 for mill profits, was acting upon information derived from the clerk, and therefore, that although the information proved incorrect, the defendant was not intending to make an incorrect return in this respect. This letter gives the profits of the mill for the last three months of the year for which defendant was making return, and the next two months of the following. The fact can hardly be overlooked by the court, on a motion for a new trial, that this is the season of the year when sales of lumber are smallest and monthly profits least. How did McEwan come to write this letter? At the request of the defendant most likely. Why did the defendant seek this partial and incomplete information, upon which to make his return of profits; or, if he came by it casually and for another purpose, why didn't he write to his clerk and get a complete statement of the profits for the nine months of the year during which he was a partner, and for which he was making a return? Men have no more right to guess under oath, when making a statement of income, than on the witness stand in court.

I see no reason to believe that if this letter had been before the jury, that it would have benefited the defendant. The facts contained in it, and the circumstances surrounding it, are ambiguous and as easily resolved against the defendant as for him. At that rate, his share of the profits for nine months was only $1,189.79, when in fact they were $2,500; and this fact had been ascertained and declared in the partnership, and Mr. Hayden had made his return for his portion accordingly to the Portland office. Is it likely that a jury would believe that a man of defendant's shrewdness and concern for his own affairs, was unaware of the real profits of the mill for 1868 at the time he made his return to Mellen? I think not. It must be admitted that the circumstances of the gross discrepancy between the sum proposed to be returned by defendant as mill profits and interest, and the true amount of mill profits, as shown by Mr. Hayden's testimony, may have had some weight with the jury, and helped their minds to the conclusion that the defendant was capable of deceit, and disposed to act disingenuously throughout the transaction. But it does not lie in the mouth of the defendant to complain of this result. The question at issue was the truth of the return as to the profits on the sale of stock, and not as to the mill profits. But the defendant thinking to get some advantage before the jury, offered the testimony of Mr. Hayden upon the latter point. The prosecution consented to its introduction, and if the result has been to the prejudice rather than the benefit of the defendant, he must submit to it.

As to the evidence of Mr. Smith; what the defendant said the McMinnville property was worth, was not the question before the jury, but what did he realize from it? Yet, the defendant having deliberately stated to Mr. Frazar in May, 1869, that it was only worth $5,000, and at the same time having sworn to a statement of income based upon the same value, when the fact was, he had sold the property, without the four-mule team, ten months before, for $9,500, the impression made upon the jury by these facts must have been against the defendant's veracity and the integrity of his intention. Would Mr. Smith's testimony probably change that impression upon another trial? He may be well satisfied, as he says, that his brother was honestly of the opinion that this property was not worth more than $5,000, and that he had no security for the remainder of the purchase money except the property, and therefore his notes were of no greater value than that sum. But to say the least of it, it is a very improbable story, and one that it cannot be presumed would outweigh in the minds of an intelligent jury the well established facts to the contrary.

It seems very strange that any man in this country, of common sense and the most limited experience and observation, should not have known that the maker of a promissory note is personally liable for its payment, although it may be also secured by mortgage; particularly, when it is remembered that the statute of the state expressly provides that the maker of such note shall be so liable in case the proceeds of the mortgaged property

is not sufficient to discharge the debt. Code Or. 251–253.

As to the value of the property, it is not pretended that any person can be found who will swear that it was worth materially less than the defendant sold it to Saxe for. Nothing of the kind was offered on the trial. The value of the property now and at the time the oath was taken is a subject upon which there is abundant testimony in the neighborhood of McMinnville. If the defendant had any good reason for believing or asserting that the property was only worth $5,000, other persons would have substantially coincided in that opinion and supported it by their testimony, if called upon. Mr. Saxe was upon the witness-stand and appeared to be a sensible, shrewd man. It is not likely that he would purchase a piece of property not worth more than $5,000 for $9,500, and pay $1,000 of that sum down. In corroboration of this opinion it may be observed he appears to have prospered by the purchase. He paid the first note when it became due on July 10, 1869, before the first trial, and probably before the conversation between Mr. Smith and defendant, in which the latter is alleged to have expressed his fears that the property was not sufficient security for the money due, and that he was afraid he would have to take it back. It is also fair to presume that the second note was paid before the second trial. Mr. Saxe did not so state, but he was not asked the question. The defendant knew whether he had or not, and if he had not, would have shown it. Indeed, taking everything into consideration, there is not a single reason to believe, or even suppose, that this property was not ample security for the sum of Saxe's notes—$8,500—when the defendant made this oath and since.

Although, as has been shown, the court is not authorized to grant a new trial on account of this evidence because it is not newly discovered, but was known to the party before the trial, yet if this were otherwise, this examination of it shows that it is not a sufficient ground for a new trial, because it does not appear to be so material that it would probably produce a different verdict if the new trial were granted. Indeed, I think that the impression of the defendant was almost, if not altogether, correct, that these matters were not material, and therefore he did not communicate them to his counsel before trial.

Before proceeding to consider whether the evidence is sufficient to justify the verdict, it will be proper to state the substance of the charge to the jury upon the questions of law involved in the verdict. The court instructed the jury in substance and effect:

I. That the acts and amendments thereto upon the subject of assessing and taxing incomes, namely, the act of August 5, 1861; July 1, 1862; June 30, 1864; March 3, 1865, and March 2, 1867, were acts in pari materia, or upon the same matter, and to be considered as one continuing and continuous act, and that therefore the defendant was bound to state and return for taxation as income all gains and profits derived from the sale of stocks in 1868, whenever purchased, so that they were purchased since August 5, 1861; and that by the terms of said acts and amendments thereto, a tax was imposed upon all gains, profits or income derived from any source whatever, unless specially excepted, and that therefore all gains and profits derived from the sale of stocks was taxable as income, whether such gains and profits were specially mentioned therein as being subject to taxation or not.

II. That the jury were first to inquire whether the affidavit of March 22, 1869, was false or not in the particular alleged; that is, had the defendant derived any gains or profits from the sale of stocks in 1868, which were taxable as income. That a mere exchange of property, as of the Wallamet Woolen Manufacturing Company stock for land or other property, was not a sale of stocks, from which profits were derived to be returned for taxation as income; because, although it might appear that one party or the other had gained by the exchange, that is, got property of greater value than what he gave cost him, yet this apparent gain might turn out otherwise, and is not realized until the property obtained is converted into cash or its equivalent. That these remarks must be understood as applying only to the case of an actual exchange of property in good faith. But where the parties to a transaction which is in fact a sale, attempt to clothe it with the forms and give it the appearance of an exchange, for the purpose of avoiding the payment of taxes on the profits derived therefrom by either party, the jury would be authorized to look through this disguise and deal with the matter according to the fact. That the estimated profits on the defendant's stocks for the years 1864–5–6–7, upon which the defendant, or the Wallamet Woolen Manufacturing Company for him, had paid income tax as undivided profits, was not liable to taxation again upon the sale of the stocks, and therefore the defendant was not bound to state the amount of such estimated profits in his return for 1868. But a transfer of stock, for which the seller takes a promissory note, is to be considered a sale for cash, provided the note is good and collectable, and an exchange of stocks for land, followed by a sale of the land within the year for cash or good and collectable notes, is to be considered as a sale of stocks for so much cash.

III. Apply these rules to this transaction. For instance, it appears that the defendant received from Kinney, for eleven shares of stock, property, notes and cash, valued by the parties at $33,000 in coin. Deduct from this, $6,000 for the 960-acre farm, which was only an exchange of property, and also $1,-

000 for the difference between the exchange price of the McMinville property and what it was sold for to Saxe, which will leave $26,000. This property being sold within the year for cash and notes, was a sale, so far as the cash is concerned, and the notes also, if you are satisfied, from the evidence, that they were good and collectable, and the defendant had good reason to believe so when he made his return. The same remark is applicable to the note of Kinney for $6,500. Assuming that these notes were good and collectable, the defendant received for his stock in cash $11,000 and its equivalent, in interest-bearing promissory notes, $15,000, in all $26,000. Convert this into currency at seventy-five cents on the dollar, gives $34,666. Deduct from this $24,958, the original cost of the stock and profits which have paid taxes as undivided profits, and the remainder, $9,708, is the least sum which the defendant was bound to have returned for taxation as profits derived from the sale of stocks within the year 1868, and not having returned any sum, his oath was false. On the other hand, if you should find that those notes were not good and collectable, or any portion of them equal to $9,708 in currency, then the defendant made no profits from the sale of stocks, and therefore his oath was not false.

IV. If you find that the oath of the defendant was false, the next and most serious question for you to determine is, whether it was knowingly, willfully and corruptly so. If the oath was intentionally taken by the defendant, knowing it to be false, or having no reason to believe it to be true, and for the purpose of gaining some advantage to himself, or defrauding or injuring any other, then he committed the crime of perjury. This is peculiarly a question for the jury to decide. In passing upon it, you should carefully consider the whole conduct of the defendant and the officers before whom the proceedings took place in which the oath was taken, and the attendant circumstances as they appear to you from the testimony. If the defendant, as a matter of law, honestly believed that he was not bound to return any profits from the sale of stocks for taxation, then, although he was mistaken and the oath be false, he did not commit the crime of perjury. In other words, a party cannot be convicted of perjury when the falsity of the oath is not attributable to a corrupt intention, but to an error of judgment or a mistake as to the law or facts. Therefore, if it appears probable from the testimony that the defendant took this oath, honestly believing that the law did not require him to return any profits on the transaction in question, you should find him not guilty. But if you should be satisfied that the defendant had no reason to believe that the law did not require him to return this sale of stocks for taxation, and that his refusal to do so for the reasons then given to the assessors was a mere quibble and pretense to avoid the payment of taxes which he justly owed the government under which he has lived and prospered, your conclusion should be otherwise.

Counsel for the defendant have taken occasion to speak before you of the law assessing and taxing incomes as an unjust, harsh and inquisitorial one. It is hardly necessary for me to remark that such assertions or considerations are not to influence your action one way or the other. Courts and juries are organized and maintained to administer and enforce laws, and not to question or pass upon the policy or propriety of them. The whole people of the United States, by their representatives in congress assembled, have determined that the law taxing incomes is needful and proper for the purpose of raising revenue. There being no question as to the constitutionality of the law, it must be enforced until the law-making power determines otherwise. Besides, in my judgment, there is no tax imposed in the United States which is generally more just and expedient than the one upon incomes. It is a tax not upon unproductive property or a venture or business which may yet prove profitless, but upon actual gains—upon prosperity—upon realized wealth. True, it is inquisitorial to some extent; but so are all laws providing for the collection of revenue. No tax can be fairly and intelligently imposed in any community without special inquiry in the affairs or condition of the party to be taxed. The state law imposing direct taxes requires the individual to make a sworn statement in writing of all the articles of property of which he is possessed, subject to taxation, including money, notes, etc. The law requiring deeds and mortgages to be registered exposes the private transactions of the parties thereto to the knowledge of the public; and upon its first introduction in England, was seriously objected to on that ground.

Again, if the incidental effect of the income act is, to give to each man some general knowledge of the pecuniary affairs of his neighbor, what harm is there in it? No honest man can be prejudiced in any community by a truthful statement of his income; and if dishonest ones or shams are thereby prevented from shirking their just share of the public burdens or imposing upon the community, so much the better. The only plausible objection that I ever heard to the law, is that it has not been generally enforced. That objection can be made to all laws imposing taxes; but if juries do their duty, this one will not be more liable to it than others.

Upon the first trial I was not satisfied whether an exchange of stocks for property should be held to be a sale or not, and therefore did not pass upon the question in my charge to the jury, but instructed them as upon the second trial, that however the law

should be construed upon that subject, if the defendant took the oath honestly believing that the law did not require him to return the sale, he could not be convicted of perjury on that account.

The sufficiency of the evidence to justify the verdict will next be considered. In the motion it is stated that the evidence is insufficient to justify the verdict because it "did not show that the oath was false; or if false, that it was knowingly or corruptly taken." The falsity of the oath is a plain question of fact. It seems to me that there can be no two opinions about it, and that it was false beyond a doubt or peradventure. Notwithstanding this, the defendant may have taken the oath innocently and without committing the crime of perjury. That depends upon whether it was knowingly and corruptly taken. This is a question of intention, and belongs almost exclusively to the jury to determine. Its determination involves the questions of what facts and circumstances were proven in the case, and what were left doubtful, the credibility of the witnesses and the weight to be given to their testimony and the inferences to be drawn from particular facts, acts and omissions. A court is not justified in setting aside any verdict unless it be clearly against the weight of evidence, and upon such a question as this, it must be manifest from all the evidence that the verdict is not right, before it ought to be set aside. Grah. & W. New Trials, 1239. It is not necessary in passing upon this motion to express an absolute opinion upon the question of the defendant's intention in this matter. Suffice it to say upon this point that in my judgment the weight of evidence is with the verdict.

The conduct of the defendant in the transaction, in most particulars of importance, was disingenuous and does not indicate integrity of purpose. For instance, if he had honestly thought for any reason that he was not bound to return this sale of stocks in his statement of income, how easy and natural it would have been for him, when asked about it by the assessor, to have candidly stated all the facts and given the reason for his opinion, and adhered to it until he learned better. Instead of this, he refused to disclose almost everything about the transaction. He asserted, and continued to assert, that he did not know what his stock cost—a matter which it was his business to know, and which the prosecution had no difficulty in proving; and finally, when he gave Mr. Frazar the cost, as the testimony shows, he stated it far above the fact. At first, he gave as a reason for not stating the matter in his income return, that it was a "swap" or trade. At the next interview with Mellen, nothing is said about its being a "swap," but he asserted that the gains, if any, had already paid tax as undivided profits—an assertion which, as the testimony shows, was materially untrue. When driven by the fear

of penalties and increased income to submit to make a statement of the transaction to Mr. Frazar, he deliberately asserted that the 960-acre farm was only worth $2.50 per acre, when it was valued in his trade with Kinney at $6,000; and when he had asked Mr. Watt $10 per acre for it, and when it appears from the uncontradicted and every way credible testimony of Mr. Watt, that in 1868, and since, the property was worth at least $7.00 per acre, or $6,720; also that the McMinnville property was worth only $5,000, not disclosing the fact that there was a valuable grist-mill upon the land, situated in one of the best and most convenient wheat regions in the country, and directly concealing the fact that in his trade with Kinney it and the mule team were valued at $10,500, and that he had sold it without the team ten months before to Saxe for $9,500—$1,000 of which was paid down; and last, but not least, to save the payment of penalties, without any apparent change of opinion in the premises, he consented to, and did, make oath to the second return of May 7, which was not only itself false as to the profits on the sale of stocks, but in direct contradiction of the oath to his first return upon this point.

There is nothing of importance in the evidence to counteract the force of these and other like circumstances which tend to show that the defendant was not very scrupulous about the truth, and that he intended to obtain some advantage to himself by avoiding the payment of taxes due the government. The weight of the evidence is with the verdict, it was technically sufficient, and as the court cannot say that it was wrong, it must not be set aside upon this ground.

In support of the fourth ground for new trial, the motion states: (1) That the law did not require the defendant to take the alleged oath, and that it was extra-judicial. This point was not raised on the trial, nor argued on the hearing of the motion, and I suppose counsel do not rely upon it. The answer to it is apparent. It is true that the law did not compel the defendant to take this oath. He might have allowed the assessor to make up his income from other information; but it permits the defendant to take the oath and be a witness in his own favor in the matter of ascertaining the amount of his income; but if he voluntarily avails himself of this privilege, he is bound to tell the truth—and the law declares that if he knowingly and willfully swears falsely, he shall be deemed guilty of perjury. 13 Stat. 239. (2) That the law did not require the defendant to return any income on account of the alleged sale of stocks. The questions made under this head were not argued by counsel for the motion, and I suppose were passed upon by the court in the progress of the trial and the instructions to the jury. In the argument of the motion, I understood the learned counsel to say that he regarded the instructions to the jury as cor-

rect, kind and considerate. On the trial the court ruled, as in the charge to the jury, that the acts relating to income must be considered as one act, and also that the annual gains upon the sale of stocks meant all gains realized in a given year, although they have been accumulating by the increase in the value of the stocks for many years—at least since 1861, while counsel for defendant maintained that the annual gains meant only the appreciation or increase in value for the year in which the sale occurred, and for which the income was returned. These and the foregoing are the principal rulings and instructions which may be said to constitute the law of the verdict, and I have heard nothing to make me doubt their correctness. All those which might be said to affect what is sometimes called "the justice of the case" were in favor of the defendant. (3) That it appeared from the testimony that the alleged offense was a mere misconstruction of the law. Whether it was a mere mistake or misconstruction of the law is a question of fact, and not of law. The court submitted the question to the jury, and instructed them that if they found the oath was false, but that the falsity was attributable to a mistake of law or fact and not to a corrupt intention, they should acquit the defendant. The jury having found the defendant guilty, by their verdict, in effect say that the testimony satisfied them that the offense was willful and corrupt perjury, and not a mere misconstruction of the law.

The fifth and last ground of the motion is the allegation of being taken by surprise in the testimony of Mellen, that he did not on March 22, 1869, know the details of the transfer of stocks by defendant to Kinney. Courts interfere with verdicts upon this ground with great reluctance. If the surprise was owing to the least want of diligence, the applicant will be without sufficient excuse, and his motion will be denied; and it has been held that a party moving for a new trial on the ground of surprise, must show that the contrary would be proved on another trial. Grah. & W. New Trials, 876, 963, 969.

Now, nearly a year elapsed between the first and second trials of the defendant, and the testimony of Mellen upon this point was substantially the same each time, so there could have been no surprise on this head at the second trial; and if the defendant was able to prove the contrary, it was his own fault that he did not do so at that time. Besides, it is difficult to perceive how the proof of Mellen's knowledge of these details would aid the defense. It is the defendant who is supposed to have concealed the facts of the transaction, and not Mellen. Again, the details that Mellen said he was ignorant of, and which he tried to obtain from the defendant, were principally the cost of these shares and what property or consideration the defendant got for them

from Kinney. Now, the affidavit of Clarke does not disclose that any of these details were ever published in the Record; besides, there is no evidence that Mellen ever saw the Record, or read the paragraph.

The motion must be denied. In coming to this conclusion, I have not overlooked the fact that the defendant is a man of means and position in this community, and that he has been able to bring to his aid to assist him in his defense all that these advantages will command, including able and experienced counsel; that nearly a year elapsed between the first and second trial, which enabled the defendant to know and prepare to meet not only the accusation against him, but the particular testimony in support of it. It is not likely that any new fact that is material would be established on a third trial, or that another jury would come to a different conclusion from the last one upon the same testimony.

The district attorney then moved for judgment. The court pronounced sentence upon the defendant as follows:

Sentence of the defendant: "William K. Smith: You have been accused by the grand jury of this district of the crime of perjury, and after a fair and impartial trial, in which you had every facility to prepare your defense, and every assistance that could be rendered you by learned and able counsel, you have been found guilty by the trial jury. The question of your intention in taking what appears to have been a false oath, belonged to them to determine. Their verdict against you, although it is possible it may be incorrect, establishes your guilt before the law, and makes it the duty of this court to ascertain and impose upon you the punishment which your crime deserves 'according to the aggravation of the offense.' The act of congress declares that upon conviction of perjury, the person convicted shall 'be punished by fine not exceeding $2,000, and by imprisonment and confinement at hard labor not exceeding five years, according to the aggravation of the offense.' It will be seen in the matter of punishment that much is left to the discretion of the court; and this is so, because of the great difference in the circumstances and ultimate end under and for which perjury is and may be committed. The person who as a witness maliciously swears falsely, with the intention of convicting another of a capital offense, is the worst and most dangerous species of a murderer. Between this and the case of one who swears falsely to save or gain a few dollars in a legal controversy, so far at least as the welfare of society is concerned, there is a wide difference. Yours is a case, where so far as the court can know, the motive was to avoid the payment of $400 or $500 taxes to the national government. The lax state of morals in this and other American communities, which excuses, if not encourages, persons to

avoid the payment of taxes justly due the national, state and municipal governments, by the use of means which would be considered dishonest between man and man, may have had much to do with the commission of this crime by you. For these reasons, and particularly on account of the recommendation of the jury, I shall make your punishment lighter than I otherwise would. I sentence you to pay a fine of $1,000, and to be imprisoned in the county jail of Multnomah county for the term of one day; and it is also ordered and adjudged that the United States have judgment for such fine, and costs taxed at $500, and that you stand committed to the jail aforesaid one day for every $2 of such fine and costs, or until the same are paid.".